UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL P. POMPEO, AS RECEIVER FOR EVERETT CHARLES FORD MILLER AND CARR MILLER CAPITAL, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE ESTATE OF OSCAR HUDSON AND THOMAS HUDSON, AS EXECUTOR OF THE ESTATE OF OSCAR HUDSON,<br><br>Defendants. | Civil Action No. 11-cv-06899 (SDW)(MCA)<br><br><br>**OPINION**<br><br><br>May 20, 2013 |

**WIGENTON**, District Judge.

Before the Court is Plaintiff Michael P. Pompeo's ("Plaintiff") Motion for Summary Judgment ("Motion for Summary Judgment") and Defendants The Estate of Oscar Hudson and Thomas Hudson, as Executor of the Estate of Oscar Hudson, ("Defendants") Cross-Motion for Summary Judgment ("Cross-Motion for Summary Judgment") pursuant to Federal Rule of Civil Procedure 56(c).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391. This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Cross-Motion for Summary Judgment is DENIED.

**FACTUAL HISTORY**

*The Receivership Action*

Carr Miller is a New Jersey Limited Liability Company and Everett Miller is its sole member and owner. (Pl.'s Statement of Uncontested Material Facts "SUF" at ¶ 1.) On December 15, 2010, the New Jersey Attorney General filed a complaint ("the Receivership Action") against Carr Miller and Everett Miller (collectively "the Miller Defendants") alleging that they were engaged in a securities fraud Ponzi scheme.[1] (SUF ¶ 1.) The Receivership Action complaint alleges that since approximately 2007, "the Miller Defendants sold securities in the form of nine month unregistered promissory notes." (SUF ¶ 2.) According to the Receivership Action, rather than using the funds received for investment purposes, the funds were comingled with other funds, transferred to third party accounts, used for personal expenses, used to pay commissions to brokers, and used to pay existing investors. (SUF ¶ 3.)

It is further alleged that "Carr Miller received in excess of $41 million from not less than 190 investors, yet only paid $11.7 million back [] in the form of interest and principal payments." (SUF ¶ 4.) Everett Miller admitted to using investors' funds to pay back other investors, and testified that borrowing from investors was "like using a credit card." (SUF ¶ 5.) At bottom, it is alleged that investors were defrauded of over forty million dollars in funds and that the Miller Defendants violated numerous provisions of the New Jersey Uniform Securities Law. (SUF ¶ 3.)

In May 2011, Michael P. Pompeo, Esq. ("Pompeo") was permanently retained as Receiver for the Miller Defendants. (SUF ¶ 7.) Following this appointment, Pompeo took possession and title to all of the Miller Defendants' real and personal property and has been attempting to ascertain the location and value of these assets. (SUF ¶¶ 8-9.) Pompeo's efforts

---

[1] The Receivership Action is captioned Dow v. Miller, et al., Docket No. ESX-C-288-10. (SUF ¶ 1.)

revealed that Carr Miller owned real property in Cherry Hill, New Jersey; Canyon Lake, Texas; and Spring Branch, Texas.[2]  (SUF ¶ 10.)

*Hudson's Investments*

Thomas Hudson ("Hudson") is a Texas resident. (Def.'s Responding Statement of Material Facts "RSF" at ¶ 1.)  In 2006, Hudson was a registered investment advisor with Carr Miller.  (SUF ¶ 13.)  Hudson was introduced to Carr Miller by another insurance broker who informed him that the company was doing "interesting things" and "providing some good rates of return."  (SUF ¶ 15.)  Following an initial meeting with Everett Miller in Texas, Hudson attended a meeting in New Jersey with Carr Miller's principals and agents.  (SUF ¶¶ 16-17.)

In the fall of 2008 and early 2009, Hudson invested the money of his father, Oscar Hudson, with Carr Miller.  (SUF ¶ 23.)  According to the Receiver's report, Hudson was one of the largest investors in Carr Miller.  (RSF ¶¶ 95-98.)  The amounts and dates of these investments were as follows: (1) $250,000.00 on September 1, 2008, (2) $407,881.14 on October 1, 2008, (3) $350,000.00 on November 15, 2008, and (4) $417,000.00 on February 15, 2009.  (SUF ¶ 23.)  The first three investments were made by Hudson under a power of attorney for his father.  (SUF ¶¶ 24-25.)  The last investment was made after his father's death as executor of his estate.  (SUF ¶¶ 24-25.)  Plaintiff asserts that Hudson lacked the legal authority to execute the February 15, 2009 investment because the power of attorney ceased upon his father's death in January 2009 and Hudson had not yet been appointed executor of his father's estate.  (Pl.'s Br. 7.)

As a Carr Miller investment advisor, Hudson was eligible to earn commissions on investments he solicited for Carr Miller.  (SUF ¶ 28.)  From October 2008 to August 2009, Hudson received commissions in excess of $45,000.00 on the investments he made for his father.

---

[2] All of these properties are subject to Defendants' mortgages in this case.

(SUF ¶ 28.) Hudson did not actively solicit or refer any other investors to Carr Miller; therefore, he did not receive commissions on any other investments.[3] (RSF ¶¶ 22-25.)

Hudson testified before the Texas State Securities Board that he believed Carr Miller had run into financial problems as of March or April 2009 and he sought a return of the investments. (SUF ¶ 29.) According to Defendants, the demand for return of the investments was related to the death of his father, and the intent was to distribute the assets of his father's estate. (Def.'s Resp. to SUF ¶ 29.) Plaintiff argues that this assertion could not be true because the largest investment occurred after the death of Oscar Hudson. (Pl.'s Br. 7.) Everett Miller told Hudson that Carr Miller was not liquid and could not return his money. (SUF ¶ 30.)

"On or about August 11, 2009[,] the Arkansas Securities Department (the "ASD") commenced an on-site investigation of Carr Miller's business operations in that state." (SUF ¶ 32.) Hudson acknowledges that he knew of the ASD investigation. (SUF ¶ 33.) On September 28, 2009, Hudson received a letter notifying him that Carr Miller would be ceasing operations in Texas and that his affiliation with Carr Miller had been terminated. (SUF ¶¶ 34, 35.) On October 20, 2009, Everett Miller sent an e-mail to Carr Miller's brokers, including Hudson, notifying them that the commission structure related to Carr Miller's notes was problematic and may expose them from a legal perspective. (SUF ¶ 36.)

*Mortgages*

In September 2009, and for the first time, Carr Miller failed to pay Hudson a check for his commission. (SUF ¶ 39.) Due to its inability to refund Hudson's money, Carr Miller

---

[3] According to Defendants, Hudson did not consider himself a Carr Miller employee and had no intention to solicit investors. (RSF ¶¶ 26-27.) One of the "insiders/brokers" of Carr Miller testified that he believed Hudson was solely an investor and was not aware he was a broker. (RSF ¶¶ 111-13.) Hercules Pappas, Carr Miller's attorney, testified that he was not aware that Hudson was an employee. (RSF ¶¶ 111-13.) Nevertheless, Plaintiff asserts that Hudson was a "registered investment advisor" with Carr Miller, and received an e-mail address and business cards identifying him as such. (Pl.'s Resp. to RSF ¶ 26.)

provided Hudson with mortgages for its three properties in Texas and New Jersey. (SUF ¶¶ 42-43.) The mortgages consisted of: (1) a mortgage on the Cherry Hill property in the amount of $440,000, (2) a mortgage on the Canyon Lake property in the amount of $117,000, and (3) a mortgage on the Spring Branch property in the amount of $300,000. (SUF ¶ 44.) The mortgages are each dated October 1, 2009; however, according to Plaintiff, "emails between Hudson and Carr Miller indicate that at least . . . the Spring Branch Mortgage[] was actually drafted and signed more than a month later." (SUF ¶ 45.) Defendants deny that the mortgage was backdated. (Def.'s Resp. to SUF ¶ 45.) Defendants claim that the mortgages were actually agreed upon by e-mail on June 1, 2009, but that the mechanics of actually executing the mortgages caused significant delay. (RSF ¶¶ 57-58.) Plaintiff argues that the record does not support the contention that there was any agreement prior to the October 1 date. (Pl.'s Resp. to SUF ¶¶ 57-58.) Furthermore, Hudson e-mailed Carr Miller's counsel on November 4, 2009 saying: "Let's write a mortgage for the Spring Branch Property." (SUF ¶ 45.) Carr Miller and Hudson executed addenda to the promissory notes which referred to notes issued on June 1, 2009, July 1, 2009, and August 15, 2009; however no such promissory notes were actually executed on those dates.[4] (SUF ¶¶ 46-51.)

According to Plaintiff, Defendants are the only investors holding mortgages on any Carr Miller properties. (SUF ¶ 10.) Defendants assert that they are the only investors with "<u>recorded</u> mortgages," however, Carr Miller either granted or attempted to grant security interests to other investors. (Def.'s Resp. to SUF ¶ 10.)

With respect to consideration for the mortgages, Plaintiff claims that Hudson "did not agree to forbear from exercising rights or agree to any extension of the maturity dates for any of

---

[4] The addenda were signed by "Tom Hudson, on behalf of Oscar Hudson," rather than "by Thomas Hudson, as executor of the Estate of Oscar Hudson." (SUF ¶ 49.)

5

the Promissory Notes." (SUF ¶ 53.) Hudson testified that he felt he had the right to sue Carr Miller "whenever he felt like it," even after the mortgages were executed. (SUF ¶ 53.) Hudson argues that he did agree to forbear from legal action, which he claims is supported by his sworn statement to the Texas Securities Board, and the fact the he did not pursue any legal action against Carr Miller. (RSF ¶¶ 50-54.) In September 2010, "Hudson's counsel proposed that Carr Miller transfer title to the properties encumbered by the Mortgages in exchange for forgiveness of the debt." (SUF ¶ 56.)

"Pursuant to Orders of the Superior Court of New Jersey dated October 18, 2011, April 13, 2012, and June 13, 2012, respectively, [Pompeo] sold the Canyon Lake Property, the Cherry Hill Property and one of two lots of the Spring Branch Property." (SUF ¶ 12.) The funds are being held pending a determination of the validity of the mortgages. (SUF ¶ 12.)

**PROCEDURAL HISTORY**

On September 19, 2011, this case commenced in the Superior Court of New Jersey, Chancery Division in Essex County. On November 23, 2011, Defendants removed the action to the District of New Jersey.

On July 18, 2012, Plaintiff filed an Amended Complaint alleging four counts: (1) constructive fraud pursuant to N.J.S.A. 25:2-25(b); (2) actual fraud pursuant to N.J.S.A. 25:2-25(a); (3) fraudulent conveyance pursuant to N.J.S.A. 25:2-27; and (4) declaratory judgment pursuant to 11 U.S.C. § 2201 that the mortgages are invalid and unenforceable. Defendants filed a Counterclaim seeking a declaratory judgment that the mortgages are valid and enforceable. Defendants also assert claims against Carr Miller for fraudulent misrepresentation and default under the promissory notes.

On December 1, 2012, Plaintiff filed a Motion for Summary Judgment. Defendants opposed the Motion and cross-moved for Summary Judgment on January 25, 2013.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." <u>Id.</u> at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. <u>Shields v. Zuccarini</u>, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"

7

Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." Black Car Assistance Corp. v. New Jersey, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

**ANALYSIS**

**I. Plaintiff's Motion for Summary Judgment**

Fraudulent transfers are governed by the New Jersey Uniform Fraudulent Transfer Act (NJUFTA), N.J.S.A. 25:2-20 et seq. Under this statute, a transfer can be set aside by a showing of actual or constructive fraud. See N.J.S.A. 25:2-25. The purpose of NJUFTA is "to prevent a debtor from placing his or her property beyond a creditor's reach." Gilchinsky v. Nat'l Westminster Bank, 159 N.J. 463, 475 (1999) (citing Klein v. Rossi, 251 F. Supp. 1, 2 (E.D.N.Y. 1966).

**A. Actual Fraud**

Actual fraud occurs when the debtor made the transfer "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor[.]" N.J.S.A. 25:2-25(a). In order to determine whether a transfer is fraudulent under this statute, the New Jersey Supreme Court has delineated

two relevant inquiries that courts should consider. See Gilchinsky, 159 N.J. at 475. These two inquiries are (1) "'whether the debtor . . . . has put some asset beyond the reach of creditors which would have been available to them' at some point in time 'but for the conveyance'" and (2) "whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor." Id. These inquiries require fact-specific determinations and the plaintiff carries the burden to prove actual intent. Id.

**1. Whether Assets Were Placed Beyond the Reach of Carr Miller's Creditors**

Pursuant to the NJUFTA, an "asset" is "property of a debtor." N.J.S.A. 25:2-21. A "creditor" is "a person who has a claim." Id. In this case, Plaintiff contends that Carr Miller placed its assets out of the reach of its unsecured creditors by granting a security interest in the mortgaged properties to Hudson, its agent. (See Pl. Br. 15.) Defendants do not deny this fact. Instead, Defendants argue that this should not be "absolutely dispositive" because Hudson himself was a creditor of Carr Miller, the Receiver has not challenged Hudson's bona fides with respect to the Notes, and there is no contention that Hudson was a participant in Carr Miller's Ponzi scheme. (Def. Br. 13.) Regardless of these facts, Carr Miller's assets would have been available to satisfy claims of unsecured creditors had they not been encumbered by the mortgages held by Hudson. (See Pl. Br. 15.) Accordingly, the first element has been satisfied.

**2. Whether Carr Miller Intended to Defraud, Delay, or Hinder Its Creditors**

In determining whether the second inquiry has been met, courts will look for the existence of certain "'badges of fraud.'" Id. at 476. These badges of fraud "represent circumstances that so frequently accompany fraudulent transfers that their presence gives rise to

an inference of intent." Id. (citing Hassett v. Goetzmann, 10 F. Supp. 2d 181, 188 (N.D.N.Y. 1998)). The statute provides that the court should consider, although not exclusively, whether:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J.S.A. 25:2-26. "In determining actual intent to defraud, courts should balance [these] factors . . . as well as any other factors relevant to the transaction." Gilchinsky, 159 N.J. at 477. Furthermore, "[a]lthough the presence of a single factor . . . may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." Id. (citing Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991); see also MSKP Oak Grove, LLC v. Venuto, 875 F. Supp. 2d 426, 436-37 (2012) (holding that four badges of fraud were sufficient to state a claim for intentional fraud).

### a. Badges of Fraud

In this case, Plaintiff argues that there are several badges of fraud that reflect Carr Miller's actual intent to defraud. Plaintiff claims that Hudson—the transferee of the Mortgages—was essentially an insider of Carr Miller. (Pl. Br. 17.) On the other hand,

Defendants contend that "there is no evidence that Carr Miller and Hudson intended to in some way benefit Carr Miller by the granting of these Mortgages." (Def. Br. 14.) Moreover, Defendants contend that Hudson was neither a statutory nor non-statutory insider. (Def. Br. 15.) Based on the record and as discussed below, this Court finds that Plaintiff has sufficiently set forth evidence indicating the existence of "badges of fraud" such that an inference of intent to defraud exists.

i. **Insider**

If the debtor is a corporation, an insider includes: (1) a director of the debtor; (2) an officer of the debtor; (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner in a partnership in which the debtor is a general partner; and (6) a relative of a general partner, director, officer, or person in control of the debtor. N.J.S.A. 25:2-22. Although these are the statutory definitions of an insider, a court can still determine that a transferee was an insider if it finds that the purpose underlying the insider factor and fraudulent transfer laws are met. Gilchinsky, 159 N.J. at 478. "The unifying theme among the enumerated persons is that they stand in such close relation to the debtor as to give rise to the inference that they have the ability to influence or control the debtor's actions." Id. (holding that although not falling within the statutory definition of an insider, the defendant's fraudulent transfer to herself classified her as an insider); see also In re Lopresti, Nos. 03-48839 and 04-2351, 2006 WL 2708605, at *9 (Bankr. D.N.J. September 19, 2006) (holding that the defendant was an insider since her friendly relationship with the debtor put her in a position to influence the debtor's actions).

Here, Plaintiff argues that Hudson was essentially an insider of Carr Miller. (Pl. Br. 17.) In support of this argument, Plaintiff points to the following facts: Hudson was a broker of Carr

11

Miller, Hudson knew that Carr Miller was under investigation and was ceasing operations in Texas, and Hudson received mortgages for real estate owned by Carr Miller as security for his investments, unlike any other investors. (Pl. Br. 18.) In response, Defendants argue—among other things—that Hudson was not an insider as he did not hold any position of authority with Carr Miller, did not make decisions with respect to Carr Miller's operations, and was in effect only an investor. (Def. Br. 11.) Defendants further state although Hudson was a large investor in Carr Miller, this did not lead him to be an insider. (Def. Br. 11.)

The parties do not dispute that Hudson does not fulfill any of the definitions of a "statutory insider." However, the facts suggest that Hudson may have had a close relationship to Carr Miller such that he could have influenced Carr Miller's actions. This Court does not need to make a determination as to whether Hudson was a non-statutory insider transferee because there is sufficient indicia of others "badges of fraud" in this case, as discussed below.

### ii. Carr Miller retained possession of properties following transfer

Defendants concede that Carr Miller retained possession of the properties after having conveyed the mortgages to Hudson. Defendants argue that this should not be viewed as a badge of fraud because a debtor's retention of possession would be true with every mortgage conveyance. Nevertheless, it is undisputed that following the transfer of the mortgages to Defendants, Carr Miller retained possession of the properties. Although not dispositive of a fraudulent transfer, as the NJUFTA guides, this factor weighs in favor of reflecting a transferor's intent to defraud.

### iii. The transfer was of substantially all of Carr Miller's assets

Plaintiff argues that with the exception of one mortgaged property, the remaining properties for which Carr Miller gave Defendants a security interest were Carr Miller's most

12

valuable assets.  (See SUF ¶ 11.)  In other words, Defendants held security interests in nearly all of Carr Miller's assets of value.  (See SUF ¶ 11.)  Defendants argue that the record does not support this contention because at the time of the mortgage transfer, Carr Miller retained real interest in several properties including Stillwater, Oklahoma ("Stillwater Property"); Garden City, South Carolina ("Garden City Property"); Maple Shade, New Jersey ("Maple Shade Property"); and Franklin Township, New Jersey ("Franklin Township Property"), and shares in Indigo Energy valued at over $18 million.  (Def Br. 17.)

The record shows that Carr Miller does not hold titles to the Garden City Property, Maple Shade Property, or Franklin Property.  (See Pompeo Cert., Ex. C. 38-39., Pompeo Cert., Ex. D. 40.)  Carr Miller holds a mortgage for the Maple Shade Property in the amount of $118,000.  (Pompeo Cert., Ex. C. 40; Pompeo Cert., Ex. D. 40.)  Also, Carr Miller holds a mortgage for the Franklin Property securing a note in the amount of $100,000.  (Pompeo Cert., Ex. C. 40; Pompeo Cert., Ex. D. 40.)  Additionally, although Carr Miller owned a significant number of shares of common stock in Indigo, the entity never generated a profit and has been insolvent.  In light of these facts, it is reasonable to conclude that Defendants held security interests on substantially all of Carr Miller's valuable assets.

### iv.     Removed or Concealed Assets

Carr Miller, in conveying its most valuable mortgages to Defendants, essentially placed Defendants ahead of other creditors.  The effect of this transfer was removing the properties from Carr Miller's estate.  Had Carr Miller not transferred the mortgages to Defendants, the properties would have been sources of recovery for Carr Miller's unsecured creditors.

### v.      Insolvency

A debtor is insolvent if (a) the sum of the debtor's debts is greater than all of the debtor's assets; or (b) the debtor is generally not paying his debts as they become due. N.J.S.A. 25:2-23. Additionally, the NJUFTA provides that "a debtor who is generally not paying his debts as they become due is presumed to be insolvent." N.J.S.A. 25:2-23(b). The parties do not dispute that at the time of the mortgages' execution, Carr Miller was insolvent.

### vi. Ponzi Scheme

Although the existence of a Ponzi scheme is not a listed badge of fraud under the NJUFTA, "'[o]ne can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other inference is possible.'" In re Global Trading Investments LLC, No. 05-1332, 2006 WL 3040918, at *7 (Bankr. D.N.J. October 25, 2006) (quoting In re Independent Clearing House, 77 B.R. 843, 860 (D. Utah 1987)). This inference is known as the "Ponzi Scheme Presumption." In re Rose, 425 B.R. 145, 152 (Bankr. M.D. Pa. 2010).[5] This presumption applies so long as the transfer was made "in furtherance" of the fraud, meaning that it was essential to the continuation of the scheme. In re Manhattan Inv. Fund Ltd., 397 B.R. 1 (S.D.N.Y. 2007).

Here, Plaintiff argues that Carr Miller was a Ponzi scheme and point to Everett Miller's testimony in the Receivership Action where he claimed to have used investor's funds like his own personal credit card and paid investors with other investor's money. (See SUF ¶ 5.) While noting that "Carr Miller did have investments which, while arguably risky or ill-founded, were at least legitimate," Defendants nevertheless concede that "aspects of the Carr Miller's operations had all the characteristics of a Ponzi scheme." (Def. Br. 21.) Considering these facts in a light most favorable to Defendants, this Court finds that Carr Miller's Ponzi scheme-like operations

---

[5] Other jurisdictions have also applied the Ponzi scheme presumption, including the S.D.N.Y., the Ninth Circuit, the E.D. Pa., and the S.D. Ohio. In re Rose, 425 B.R. at 152. One court has analogized the presumption as "one big badge of fraud." In re Polaroid Corp., 472 B.R. 22, 35 (Bankr. D. Minn. 2012).

reflect that Carr Miller's transfers of mortgages to Defendants were made with an intent to defraud.

### b. Good Faith and Equivalent Value

Under the NJUFTA, a transfer is not void for actual fraud if the transferee received the transfer "in good faith and for a reasonably equivalent value." N.J.S.A. 25:2-30(a). "In evaluating the innocence, or good faith, of the transferee, the court takes an objective approach to determine what the transferee knew or should have known 'such that a transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer.'" In re Hill, 342 B.R. 183, 203 (Bankr. D.N.J. 2006) (internal citations omitted). In the instant matter, the record indicates that Hudson was at least on inquiry notice of Carr Miller's financial circumstances at the time the mortgages were recorded. For instance, Hudson conceded that before the execution of the mortgages, he learned of the ASD investigation into Carr Miller's activities. (SUF ¶ 33.) Additionally, Hudson received an email on October 20, 2009—a month before the first of the mortgages was recorded—informing him that Carr Miller's sale of unregistered promissory notes was illegal and that its brokers faced criminal liability. (See SUF ¶ 36.) Hudson also knew when he received the mortgages that Carr Miller was insolvent. (SUF ¶¶ 31, 40.) Accordingly, for the purposes of the NJUFTA, this Court finds that Hudson did not receive the mortgages in "good faith."

The NJUFTA provides that a transfer is for a "reasonably equivalent value" if "in exchange for the transfer or obligation, property is given for a transferred or antecedent debt." N.J.S.A. 25:2:24(a). In this case, Defendants argue that the mortgages transferred from Carr Miller to Hudson were in exchange for (1) an alleged agreement by Hudson to forbear suing on the Promissory Notes; and (2) antecedent debt. Although Hudson testified that Miller did not

15

agree to provide Hudson with any security until he threatened suit, nothing in the written record reflects that Hudson threatened to sue Carr Miller or that the conveyance of the mortgages served as forbearance from suing Carr Miller. As for antecedent debt, Defendants claim that the value of the mortgages was "reasonably equivalent" to the value of the amount of money invested by Hudson. However, at the time of the conveyance, the mortgages were much more valuable than the promissory notes, as the promissory notes had a market value of zero. Given these facts, the transfer of mortgages to Hudson was not for a reasonably equivalent value.

Based on the several badges of fraud—even without concluding whether Hudson was an insider transferee—this Court finds that Carr Miller's conveyance of mortgages to Defendants was a transfer of assets made with an actual intent to hinder, delay, or defraud Carr Miller's unsecured creditors. Accordingly, Plaintiff is entitled to Summary Judgment.

## II. Defendants' Cross-Motion for Summary Judgment

Count I of Defendants' Counterclaim seeks a declaratory judgment determining that the mortgages at issue in this case are valid and enforceable. In light of granting summary judgment in favor of Plaintiff on the issue of actual fraudulent conveyance of the mortgages, Count I of Defendants' counterclaim is moot.[6]

Count II and III of Defendants' Counterclaim seek recovery for Carr Miller's alleged default under the Promissory Notes and fraudulent misrepresentation. Defendants' sole avenue of recovery with respect to the alleged default under the Promissory Notes and fraudulent misrepresentation is to file a proof of claim with the Receiver. See N.J.S.A. 14A:14-13 (any lien against property of a corporation is void if such lien was obtained by judgment after the

---

[6] This Court notes that even if Count I of Defendants' counterclaim was not moot, summary judgment would not be granted in favor of Defendants at this juncture in light of the disputed facts and arguments that Hudson was an "insider."

commencement of a receivership action). Accordingly, Defendants' Cross-Motion for Summary Judgment is denied.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Cross-Motion for Summary Judgment is DENIED.

s/Susan D. Wigenton, U.S.D.J.

cc: Madeline Cox Arleo, U.S.M.J.